# EMERY CELLI BRINCKERHOFF ABADY WARD

JONATHAN S. ABADY
MATTHEW D. BRINCKERHOFF
ANDREW G. CELLI, JR.
RICHARD D. EMERY
DEBRA L. GREENBERGER
DIANE L. HOUK
DANIEL J. KORNSTEIN
JULIA P. KUAN
HAL R. LIEBERMAN
ILANN M. MAAZEL
KATHERINE ROSENFELD
ZOE SALZMAN
SAM SHAPIRO
EARL S. WARD
O. ANDREW F. WILSON

ATTORNEYS AT LAW
600 FIFTH AVENUE AT ROCKEFELLER CENTER
10TH FLOOR
NEW YORK, NEW YORK 10020

TEL: (212) 763-5000
FAX: (212) 763-5001
www.ecbawm.com

DANIEL M. EISENBERG
ARIADNE M. ELLSWORTH
SARA LUZ ESTELA
LAURA S. KOKOTAILO
SONYA LEVITOVA

---

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: 4/1/2024

---

> Through this renewed motion to seal, Plaintiff has proposed narrow redactions to the document at ECF No. 144-2, which was previously filed under seal by Defendants in connection with Defendants' motion to preclude Plaintiff's expert.  The Court finds that the redactions are appropriately narrowly tailored in order to protect information that, if disclosed, could reveal Plaintiff's identity and place Plaintiff in danger in light of the nature of his work as a confidential informant.  Accordingly, Plaintiff's motion is GRANTED.
> The Clerk of the Court is respectfully directed to terminate the motions at ECF No. 143 and 154 and to maintain the unredacted document at ECF No. 144-2 under seal.  The redacted version, attached to this Order, is publicly filed below and at ECF No. 154-1.

**SO ORDERED:**

*/s/ Katharine H. Parker*
HON. KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE    4/1/2024

*Via ECF*

Hon. Katharine H. Parker
United States District Court for the
Southern District of New York
500 Pearl Street, Room 750
New York, New York 10007

Re:   *John Doe v. City of New York, et al.*, 22-CV-2690 (PKC) (KHP)

Dear Judge Parker:

This office represents Plaintiff in this case.  We submit this letter-motion to the Court to respectfully request, pursuant to the Court's Order of March 15, 2024 (ECF No. 151) and the Court's Individual Practices, that the Court permit the filing of a redacted version of the Plaintiff's expert report, attached hereto as Exhibit A.

Redaction is requested because the report contains highly sensitive information regarding Plaintiff and his work as a confidential informant, as well as the contents of materials designated Confidential pursuant to the Stipulation of Confidentiality and Protective Order entered on June 27, 2023 (ECF No. 11), which could reveal Plaintiff's identity.  For Plaintiff's safety, his identity has been sealed and protected since the case was filed.  *See* ECF No. 146 at 1 n.1 (filing decision in redacted form to protect highly sensitive information about Plaintiff and his work as a confidential informant); *see also Tomassini v. FCA US LLC*, No. 14 Civ 1226, 2017 WL 9400672, at *4 (N.D.N.Y. Jan. 6, 2017) ("Higher values that have been found to overcome the First Amendment [right to access judicial documents] include . . . a person's physical safety"); *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2022 WL 17751466, at *2 (S.D.N.Y. Dec. 19, 2022) (finding narrowly tailored redaction of names and identifying information appropriate to preserve the "higher value[] of witness safety" (citing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006)).

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
Page 2

   We contacted counsel for Defendants on March 21, 2024 and March 25, 2024 to inquire about Defendants' position on this matter but have not yet received a response.

   We thank the Court for its consideration.

                Respectfully submitted,

                /s/
                Emily K. Wanger

c.  All Counsel, via ECF

# Exhibit A

Joseph A. Pollini
107-24 71 Road, PH2C
Forest Hills, New York, 11375

Andrew G. Celli, Jr.
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue
10th Floor
New York, NY 10020

    Re:  *John Doe v. City of New York, et al.*, No. 22 Civ. 2690 (PKC) (KHP)

1.  Pursuant to Plaintiff's request, I have prepared this report, which constitutes my initial evaluation and conclusions within a reasonable degree of professional certainty, regarding the actions and procedures employed by members of the New York City Police Department ("NYPD") in connection with this matter.

2.  My fee for preparation is $300.00 per hour and $3,000.00 per day or part thereof for deposition or trial testimony. This evaluation is based on a review of the documents provided and my experience, training, education, and professional background, which are described below.

3.  I am a retired member of the NYPD, having served on the force for more than 33 years. During my tenure, I held the ranks of Police Officer, Investigator, Sergeant, Lieutenant, and Lieutenant Squad Commander. I served in numerous capacities including patrol officer; investigator; patrol sergeant; detective squad sergeant; and lieutenant squad commander of the Brooklyn Robbery Squad, 81 Detective Squad, and the Cold Case Homicide Squad. Over the years I responded to, investigated, and made arrests in connection with more than a thousand cases of assaults, robberies, kidnapping, homicides, and other crimes. I served as a member of the Hostage Negotiating Team for 17 years, and I trained members of the FBI on kidnapping investigation tactics. I testified in court numerous times, including providing testimony pertaining to criminal matters and proper police procedures.

4.  I have the following experience with Confidential Informants ("CIs") as a member of the NYPD. While an undercover narcotics Detective for the NYPD, I worked with CIs to infiltrate drug organizations. I also registered and handled CIs at various times in my NYPD career, including when I was a detective in the Homicide Squad, the Precinct Detective Squad, and the Major Case Squad. After I was promoted to Sergeant, I supervised approximately a dozen detectives who had informants reporting to them, and part of my supervision involving providing on-the-job training about running CIs and overseeing their handling of CIs. As a Lieutenant in charge of the Cold Case Homicide Squad, Special Projects Unit, I oversaw many investigations that relied on informants.

5.  After I retired from the NYPD, I became a member of the faculty at John Jay College of Criminal Justice. I taught at John Jay for approximately 28 years. I was a member of

1

the full-time faculty at John Jay with tenure for approximately 15 years. I also served as the Deputy Chairperson of the Law/Police Science and Criminal Justice Administration Department. While at John Jay, I taught undergraduate and graduate level courses in police science and criminal justice and lectured extensively about proper police practices for working with Confidential Informants.

6. The following is a list of materials pertaining to the incident and individuals involved in this case that have been provided for my review thus far: (a) Complaint; (b) a copy of the full transcript of the July 27, 2023 deposition of Defendant Richard Roe and marked exhibits; (c) a copy of the full transcript of the July 20, 2023 deposition of Plaintiff John Doe and marked exhibits.

## SUMMARY OF RELEVANT FACTS

7. For purposes of this report, I accepted the following facts as true which I understand to be undisputed by the parties.

8. John Doe was a Confidential Informant for the NYPD for approximately five years.

9. From around ▮ through ▮ Richard Roe was John Doe's "handler." This means he was the member of the NYPD who was responsible for tasking John Doe with undertaking operations such as ▮, meeting with John Doe and speaking with him over the phone to obtain intelligence regarding criminal activity, paying John Doe for his work as a CI, and updating paperwork pertaining to John Doe's work as a CI.

10. On ▮, Plaintiff John Doe and Defendant Richard Roe spoke by telephone. During that conversation, John Doe told Richard Roe that he had information about a ▮ that had occurred in the ▮—specifically, that he knew the ▮. *See* Roe Dep. Tr. at 147:24-150:25. Richard Roe did not document the fact that John Doe had called him with information about ▮. *See* Roe Dep. Tr. at 159:10-15.

## EVALUATION AND OPINION

11. Based upon my review of the above-stated materials, and in the exercise of my judgement and expertise, it is my opinion, within a reasonable degree of professional certainty, that Defendant Richard Roe did not follow proper and accepted police practices in his handling of Confidential Informant John Doe in the following ways.

### *Failures to Document CI-Handler Interactions*

12. Richard Roe testified at his deposition that he spoke to John Doe on ▮, and that Doe told him Doe had information about ▮. Roe testified that Doe referred to the ▮ and stated that he knew ▮. *See* Roe Dep. Tr. at 147:24-150:25. According to proper, accepted, and standard police practices, Richard Roe was required to document this conversation with his CI.

2

13. The NYPD Patrol Guide Procedure No. 212-68, at p. 4, ¶ 32 states: "Require contacts to submit written reports on **CONFIDENTIAL INFORMANT INFORMATION CHANGE, ACTIVITY AND PAYMENT** for each interaction with an informant and file in the informant's folder." At his deposition, Richard Roe testified that he only documented "interactions [with CIs] that lead to information," such as "interactions with [a] CI . . . used for controlled buy operations." Roe Dep. Tr. at 59:11-60:6. However, the NYPD's Patrol Guide requires documentation for "each interaction with an informant."

14. In addition to the Patrol Guide, it is proper, accepted, and standard police practice for a handler to document each interaction with a CI. Full documentation of all CI contacts is important because it allows issues to be brought up the chain of command and it protects the handler if later disputes arise about what occurred. It is also critical to document all CI contacts to avoid the possibility of corruption. If Internal Affairs becomes involved in a situation involving a CI, they will expect to see full documentation of all contacts between the CI and handler.

15. According to his own testimony, Richard Roe received a text message from John Doe on ▓▓▓▓▓▓▓▓▓ *See* Roe Dep. Tr. at 161:4-163:16. According to proper, accepted, and standard police practice, that text message should have been saved in the CI folder. In addition, I would expect a detective to send a copy of this text to the squad investigating ▓▓▓▓▓▓ The reason that text message should have been saved in the CI's file is because all forms of communication between a CI and a handler must be documented to provide a complete picture of an investigation, including the progression of events. Text messages often become important pieces of evidence and should be preserved in case something happens to the sender or recipient or their phones. In a worst-case scenario in which a CI is killed, all communications between the CI and his/her handler are critical to understanding what happened. Finally, if a CI gave a handler information about ▓▓▓▓▓▓ I would expect that the handler to notify his/her supervisor and request a meeting between the handler and his/her supervisor and the investigating detective and his/her supervisor.

16. Richard Roe also testified that he contacted Officer ▓▓▓▓ at the ▓▓▓▓ after John Doe advised that he had information about ▓▓▓▓▓▓ *See* Roe Dep. Tr. at 151:15-152:5. According to proper, accepted and standard police practice, Roe's outreach to ▓▓▓▓ should also have been documented in Doe's CI folder, and Roe should also have reported this call to his own supervisor.

### *Handler's Use of Personal Cellphone To Communicate with CI*

17. Assuming the truth of John Doe's allegation that Richard Roe provided John Doe with his cellphone number, that conduct would violate NYPD practice and protocol. Handlers should not provide CIs with their personal cellphone numbers. Police business should be conducted on police phones; that is the purpose of the department providing a department phone to all officers. The reason it is bad practice for a handler to provide his/her personal cellphone number to a CI is that it blurs boundaries. Handlers are not supposed to become friends with CIs or have social relationships. It is also important for handlers to contact their CIs using only their police phones in case the handler is killed or incapacitated, in which case other officers can access all communications that handler had with his/her CIs on his/her police phone.

3

### *Frequency and Content of Contacts between Handler and CI*

18. According to Richard Roe's deposition testimony, he did not have a practice of contacting his CIs, including John Doe, at regular intervals but instead contacted them on an as-needed basis when he wanted to speak with them about an investigation or incident. Roe Dep. Tr. at 49:10-52:7. Records of communications between Richard Roe and John Doe show that they were not in regular contact between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A ten-week time period without regular contact between a CI and handler is an unusually long time period and is not consistent with proper, accepted, and standard police practice. While there is no clear-cut rule about how often a handler should contact a CI, such conduct should be regular. If the CI is active, NYPD policy and practice is to have regular contact, whether weekly or monthly. Part of the job of the handler is to initiate and maintain contact with registered CIs and to check in on CIs, who are critical sources of information. If the handler is not in touch with the CI and the CI is not producing information, it raises the question of whether the CI should be de-activated. A ten-week stretch without regular contact between a CI-hander would raise questions such as whether the CI had been locked up, whether the CI should be de-activated, whether the CI was in danger and needed to be re-located. A handler has an obligation to stay on the CI and monitor his/her behavior, and the only way to do this is to maintain regular conduct. Here, it was incumbent on Roe to initiate and maintain contact with Doe with greater frequency.

19. Another purpose of regular debriefings is that the handler should be checking in with the CI about his/her activities, including asking whether he or she has had any contacts with known criminal suspects or persons possibly engaging in criminal conduct. It is also a part of standard and regular debriefings for the handler to ask the CI what the CI is doing to maintain cover. CIs are expected to engage in deception to keep their cover and a handler should have an awareness of what is occurring in this regard.

### *Consequences of Failure to Comply with NYPD Policies*

20. NYPD officers who fail to comply with NYPD policies, including the Patrol Guide, face different types of sanctions as a result of those failures, including criticism and discipline. Depending on the severity and frequency of an officer's failure to comply with NYPD policies, he or she may experience adverse career consequences within the NYPD.

21. Richard Roe's failures to comply with NYPD policies set forth above, could have led to discipline including verbal reprimand, loss of time, or reassignment, if they came to light.

### **CONCLUSION**

22. For the above reasons, it is my opinion within a reasonable degree of professional certainty that the Richard Roe violated the proper, accepted, and standard police practices and procedures in connection with his handling of Confidential Informant John Doe.

23. I reserve the right to supplement this report upon review of additional materials that may be available.

4

Dated: December 15, 2023
Forest Hills, NY

*JOSEPH POLLINI*

5

*Joseph A. Pollini*
*Police Expert, Inc.*
*107-24 71 Road-PH2C*
*Forest Hills, New York 11375*

**Education:**

- 1995 – MA Criminal Justice. John Jay College of Criminal Justice, C.U.N.Y.
- 1992 – BS Degree – Police Science. John Jay College of Criminal Justice, C.U.N.Y.

**Professional Experience:**

For over 33 years, I served as a member of the New York City Police Department. During this time I served the department in the following ways:

- As a patrol officer
- As an narcotics investigator. I was also designated to train incoming narcotics investigators.
- Assigned as a bomb and explosives investigator. During this time I played an integral role in the investigation of terrorist bombing incidents.
- Assigned as a homicide investigator in the Brooklyn North and Brooklyn South Homicide Units.
- Served the department as a patrol supervisor.
- Commander of a unit within the School Program to Educate and Control Drug Abuse. This was a pilot project where members of the police department educated students in the New York City Public School System on the detriments of narcotics use. This program was evaluated by John Jay College and as a result of their report, the program was instituted citywide.
- Assigned as an investigator and subsequently as a Detective Sergeant and Detective Lieutenant Commander in the Major Case Squad. In this unit, I investigated, directed, and supervised bank robbery investigations, truck hijackings, kidnappings, assaults on police officers, and confidential investigations for the Chief of Detectives and the Police Commissioner.
I participated in and supervised the execution of many search warrants.
I also trained members of the FBI on kidnapping investigative tactics.
- Served as a member of the Hostage Negotiation Team for 17 years.
- Served the department as a precinct detective squad commander and robbery squad commander.
- Commander the Cold Case Homicide Squad, Special Projects Unit. I was designated to command this unit from its inception in 1996. In this unit I worked very closely with federal investigators and federal prosecutors to develop cases against violent gangs. I was also designated by the department during this time to develop an investigative plan to

identify and eradicate violent gang activity. This plan was subsequently implemented and is still used today to combat gang violence.

**Honors and Recognition:**

During my career in the New York Police Department, I received numerous citations for outstanding police service and bravery. I was also given an award for not reporting sick during my entire 33 year career.

**Professional Training:**

The following is a list of training courses that I attended while a member of the New York City Police Department:

- Police Academy Recruit Training Course
- 1972 – Narcotics Identification and Undercover Operative Training
- 1974 – Criminal Identification Course
- 1977 – FBI Bomb/Explosives Investigators Course
- 1978 – Arson Investigators Course
- 1979 – Photography Course (Nikon)
- 1980 – Homicide Investigators Course
- 1981 – Sex Crimes Investigators Course
- 1982 – Auto Crime Investigators Course
- 1984 – BMOC-Sergeants Training Course
- 1984 - Dignitary Protection Course
- 1985 – Methods of Instruction Course
- 1985 – Hostage Negotiation Course
- 1989 – Lieutenants Training Course

**Service at John Jay College:**

For over 28 years, I have had the opportunity to serve the college in many ways, including:

- Deputy Chair Person – Law/Police Science/ Criminal Justice Administration.
- Police Studies Coordinator - Law/Police Science/Criminal Justice Administration.
- Full Time Faculty – Lecturer- CCE– Department of Law/Police Science/Criminal Justice Administration.
- Served as a Substitute Assistant and Adjunct Assistant teaching in the Department of Law, Police Science and Criminal Justice Administration, where I have taught a total of 18 undergraduate and 5 graduate level courses.
- As an instructor in the Office of Special Programs.
- As an instructor and coordinator for the policing program to upgrade policing in the Dominican Republic. I also acquired and supplied the program with training manuals from

- the New York City Police Department to teach officers at the Dominican Republic Police Recruit Training School.
- As an instructor in the program operated in the New York City public schools, which seeks to explain police operations to students and faculty.
- Being quoted in numerous local, national and international news media on police and investigative subject matters.
- Serve as a media representative for the college on police related matters
- Represented the college during a seminar at the New York Bar Association as an expert on interrogation.
- Served as the Coordinator for the John Jay College, Criminal Justice Society.
- As a freshman advisor, course fair advisor and as a faculty member who has been cited by Dean's List students and the Student Council for providing outstanding support and advice.
- Serve as a liaison with numerous national and international police agencies. I also meet regularly with representatives from various international police agencies and provide them with guidance in various police related matters.
- Serve as a police consultant for many of my college colleagues.
- I have developed courses for the Graduate Studies Program dealing with policing and investigations.
- Assisted the United States Marine Corps in developing a community policing program that was utilized in Iraq to foster better relations between the Marines and the Iraqi people.

**Expert Witness**
- I have testified on numerous occasions in Federal and State Court as a police officer. I am also qualified as a police procedures expert in Federal and New York State Courts.

I have testified as an expert at trial or by deposition in the following cases, within the past 4 years:

Brian Pettiford v. City of Yonkers, et al., S.D.N.Y. Case No. 14-cv-06271 (JCM)

Teresa Cordero v. Jose Nunez, et al., N.Y. Supreme Court. Index No.: 030031/2016.

Martinez v. City of New York, et al., E.D.N.Y. Case No. 16-cv-79 (AMD) (CLP)

Andrews v. City of Cleveland, N.D. Ohio. Case No. 1:22-cv-00250.

Fulton v. City of Chicago et al., 20-cv-3118/Mitchell v. City of Chicago, et al., N.D. Ill. Case No. 20-cv-03119.

Kristin Stein v. Town of Greenberg et al., S.D.N.Y. Docket No. 7:21-cv-05673 (PMH).

**President of "Police Expert, Inc." Consulting company.**
    Specializing in providing police procedure expert testimony. Qualified as a police procedures expert in Federal and State court.

President of "J. Pollini, Investigative and Security Consultants, Inc."